IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

DEBRA J. POTTER,                           )        Civil Action No. 3:04-22385-CMC-JRM
                                           )
              Plaintiff,                   )
                                           )
        v.                                 )
                                           )
COMMISSIONER OF SOCIAL SECURITY, )        **REPORT AND RECOMMENDATION**
                                           )
              Defendant.                   )
                                           )

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On July 2, 1999, Plaintiff applied for DIB. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held November 16, 2000, at which Plaintiff appeared and testified, the ALJ issued a decision dated October 30, 2001, denying benefits. The Appeals Council denied Plaintiff's request for review and Plaintiff filed a civil action in this Court. The Court remanded the matter to the agency pursuant to sentence four of 42 U.S.C. § 405(g). Tr. 341. On March 31, 2003, the Appeals Council vacated the prior decision and remanded the case to the ALJ. Tr. 347-348. A supplemental hearing, at which Plaintiff and a vocational expert ("VE") testified, was held before the ALJ on December 4, 2003. On January 22, 2004, the ALJ issued a second decision denying benefits, concluding that work exists in the national economy which Plaintiff can do.

Plaintiff was forty years old at the time of her alleged onset of disability and forty-six years old at the time her insured status expired on December 31, 2003. She has a high school education and she completed half an academic year of college. Plaintiff worked in her past relevant work as a retail cashier and a reconciler at the banking operation center. She alleges disability since May 19, 1998, due to lower back pain, neck pain with numbness and tingling in her arms and fingers, and elbow pain.

The ALJ found (Tr. 332-334):

1.    THE CLAIMANT MET THE NONDISABILITY REQUIREMENTS FOR A PERIOD OF DISABILITY AND DISABILITY INSURANCE BENEFITS SET FORTH IN SECTION 216(I) OF THE SOCIAL SECURITY ACT AND IS INSURED FOR BENEFITS THROUGH DECEMBER 31, 2003.

2.    THE CLAIMANT HAS NOT ENGAGED IN SUBSTANTIAL GAINFUL ACTIVITY SINCE THE ALLEGED ONSET OF DISABILITY.

3.    THE CLAIMANT'S PAIN DISORDER, DEPRESSIVE DISORDER NOT OTHERWISE SPECIFIED, AND MUSCULOSKELETAL IMPAIRMENTS OF THE CERVICAL AND LUMBAR SPINES ARE CONSIDERED "SEVERE" BASED ON THE REQUIREMENTS IN THE REGULATIONS 20 CFR § 404.1520(C).

4.    THESE MEDICALLY DETERMINABLE IMPAIRMENTS DO NOT MEET OR MEDICALLY EQUAL ONE OF THE LISTED IMPAIRMENTS IN APPENDIX 1, SUBPART P, REGULATION NO. 4.

5.    THE UNDERSIGNED FINDS THE CLAIMANT'S ALLEGATIONS REGARDING HER LIMITATIONS ARE NOT TOTALLY CREDIBLE FOR THE REASONS SET FORTH IN THE BODY OF THE DECISION.

6.    THE CLAIMANT HAS THE RESIDUAL FUNCTIONAL CAPACITY TO PERFORM A RANGE OF HEAVY WORK, RESTRICTED TO PRECLUDE REPETITIVE PUSHING AND PULLING WITH THE UPPER EXTREMITIES AND ANY CLIMBING. THE CLAIMANT'S MENTAL IMPAIRMENTS FURTHER RESTRICT HER RESIDUAL

2

FUNCTIONAL CAPACITY TO WORK INVOLVING NO MORE THAN LIMITED CONTACT WITH THE GENERAL PUBLIC.

7.  THE CLAIMANT IS UNABLE TO PERFORM ANY OF HER PAST RELEVANT WORK.  (20 CFR § 404.1565).

8.  THE CLAIMANT WAS A "YOUNGER INDIVIDUAL BETWEEN THE AGES OF 18 AND 44" AS OF HER ALLEGED ONSET DATE (20 CFR § 404.1563).

9.  THE CLAIMANT HAS "MORE THAN A HIGH SCHOOL EDUCATION" (20 CFR § 404.1564).

10. TRANSFERABILITY OF SKILLS IS NOT AN ISSUE IN THIS CASE (20 CFR § 404.1568).

11. THE CLAIMANT HAS RETAINED THE RESIDUAL FUNCTIONAL CAPACITY TO PERFORM A SIGNIFICANT RANGE OF HEAVY WORK (20 CFR § 404.1567).

12. ALTHOUGH THE CLAIMANT'S EXERTIONAL LIMITATIONS DO NOT ALLOW HER TO PERFORM THE FULL RANGE OF HEAVY WORK, USING MEDICAL-VOCATIONAL RULE 204.00 AS A FRAMEWORK FOR DECISION-MAKING, THERE ARE A SIGNIFICANT NUMBER OF JOBS IN THE NATIONAL ECONOMY THAT SHE COULD PERFORM.  EXAMPLES OF SUCH JOBS INCLUDE WORK AS AN ORDER FILLER (6,000 SUCH JOBS); STOCK CLERK (5,000 SUCH JOBS); INVENTORY CLERK (6,000 SUCH JOBS); AND DESK CLERK (20,000 SUCH JOBS).  ALL NUMBERS GIVEN ARE FOR JOBS IN THE SOUTH CAROLINA ECONOMY.

13. THE CLAIMANT WAS NOT UNDER A "DISABILITY," AS DEFINED IN THE SOCIAL SECURITY ACT, AT ANY TIME ON OR BEFORE HER DATE LAST INSURED (20 CFR § 404.1520(F)).

On July 23, 2004, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner.  Plaintiff filed this action on September 29, 2004.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.…" See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## DISCUSSION

Plaintiff alleges that: (1) the ALJ erred in failing to properly credit the opinions of two of her examining physicians, Dr. Brannon and Dr. Boyd; and (2) failed to properly evaluate her subjective complaints.

A.    Substantial Evidence

Plaintiff appears to allege that the ALJ's decision is not supported by substantial evidence. In particular, Plaintiff claims that the ALJ failed to properly credit the opinions of consulting physicians Dr. Brannon[1] and Dr. Boyd. The Commissioner contends that substantial evidence supports the Commissioner's decision. Substantial evidence is:

---

[1]In her memorandum, Plaintiff incorrectly refers to Dr. Brannon as "Dr. Brabham." Although Plaintiff was treated by Dr. Brabham twice in 1998, Plaintiff's memorandum discusses the 2001 consultative examination by Dr. Brannon, not treatment by Dr. Brabham. See Tr. 307-309.

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966).  It must do more, however, than merely create a suspicion that the fact to be established exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

The ALJ's decision is supported by the findings of Plaintiff's treating physician,[2] the findings of numerous examining physicians and a psychologist, the State agency physicians and psychologists, and non-medical evidence.  Plaintiff claims that her disability began after she had a hemorrhoidectomy on May 18, 1998.  Local and spinal anesthesia were administered and there were no complications during the procedure.  Tr. 114-129.  Plaintiff subsequently developed fecal impaction.  Dr. Sheppe administered spinal anesthesia to Plaintiff and performed a disimpaction procedure on June 10, 1998.  Tr. 131-135, 140.  Plaintiff returned to the hospital two days later, at which time sedatives were administered, she was admitted for observation and rehydration, a liquid diet was prescribed, and she was discharged on June 14, 1998.  Tr. 138-139, 147-152.

From April 1998 to March 1999, Plaintiff was primarily treated by Dr. Michael Beaver, a family physician.  Tr. 238-261.  On July 28, 1998, Plaintiff complained of continuing elimination problems, general aches, and pain in her left hip since hemorrhoid surgery.  On August 13, 1998, Plaintiff reported pain in her upper back and neck, but not as much joint pain.  Dr. Beaver opined that Plaintiff had some fibromyalgia, and suggested she visit a rheumatologist

---

[2]See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)(treating physician's opinion entitled to great weight).

5

to confirm the diagnoses, but Plaintiff rejected the suggestion.  He noted it would be reasonable

for Plaintiff to go back to work the following week if she felt better.  Dr. Beaver prescribed Elavil

and Ultram for Plaintiff's pain.  Tr. 258.  On August 24, 1998, Plaintiff complained to Dr. Beaver

of upper back pain and tingling in the fingers of her left hand.  Plaintiff reported that Daypro

relieved her pain, but made her sleepy.  Dr. Beaver referred Plaintiff to a neurologist for nerve

conduction studies and prescribed Darvocet and Daypro for pain.  Tr. 256.[3]  On September 1,

1998, Plaintiff made general complaints of pain.  Dr. Beaver noted that Plaintiff's motor

functioning and sensory complaints were grossly intact and her reflexes were 2+ in her patella,

biceps, and triceps.  Tr. 252.   On September 21, 1998, Plaintiff underwent a whole body bone

scan ordered by Dr. Beaver. The results of the scan were within normal limits.   Tr. 243.  On

October 16, 1998, Dr. Beaver arranged a referral to a tertiary care center.  Tr. 242.  A physical

therapist at Palmetto Baptist Medical Center wrote to Dr. Beaver that after nine therapy sessions,

Plaintiff reported a significant improvement in her neck, but unrelenting back pain.  Tr. 204.  On

December 2, 1998, a physical therapist reported to Dr. Beaver that after fifteen sessions, Plaintiff

had a "significant improvement in her condition."  Tr. 202.  The therapist noted that the range of

motion in Plaintiff's neck had increased greatly and her treadmill endurance increased from five

to ten minutes.  Tr. 202.

---

[3]Dr. Beaver stated in a note dated August 26, 1998, that Plaintiff was not able to work and would not be able to return to work until he released her to do so.  Tr. 255.  The ALJ's decision to discount this opinion is supported by substantial evidence because it was prepared soon after Plaintiff's alleged onset date, it did not meet the twelve month requirement, and the form of the letter indicates that Dr. Beaver was addressing Plaintiff's ability to return to her most recent job and not her capacity to perform any work.

The ALJ's decision is also supported by the findings of consulting physicians. A number of these examining physicians opined that Plaintiff's theory that her hemorrhoid surgery and fecal disimpaction caused her lumbar spondylolysis and cervical disc bulge was improbable and the spondylsosis at L5 had been present for many years, possibly even since her childhood. See Tr. 161, 163, 176, 181, and 184. Despite this impairment, Plaintiff continued to work for a period of years. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)(claimant who worked with impairments over a period of years without any worsening of condition was not entitled to disability benefits); Cauthen v. Finch, 426 F.2d 891, 892 (4th Cir. 1972)(finding claimant was not disabled where she had eye problems of long standing, worked regularly for years despite the problem, and had no significant deterioration).

On August 18, 1998, Plaintiff was examined by Dr. Richard DuBose, an anesthesiologist at the Center for Pain Management at Baptist Medical Center. Tr. 161-165. Dr. DuBose noted that Plaintiff was "very hostile and angry." Examination revealed that Plaintiff was "rather hypersensitive to pain" and was "quite angry and anxious to blame her pain on her [hemorrhoid] surgery, or her anesthetic, or something that occurred during that period." Dr. DuBose reported that he tried to explain to Plaintiff that there was no logical reason to suggest that her surgery and/or anesthesia caused her pain symptoms. He prescribed a low dose of Neurontin and encouraged Plaintiff to enroll in the full pain management program. Tr. 161-165.

On August 31, 1998, Dr. Mark Lencke, a neurologist, performed nerve conduction studies of Plaintiff's upper extremities. Results of the study were unremarkable and showed no evidence of carpal tunnel syndrome. Tr. 173-174. Dr. Lencke conducted a neurological examination of Plaintiff on September 10, 1998. He reported that Plaintiff was very emotional and tearful

throughout the examination; she would not allow him to perform a funduscopic examination of her eyes, test her neck strength, or complete coordination testing; and her muscle strength could not be graded because she gave way in all muscle groups. Plaintiff claimed diffuse pain to touch in all extremities and Dr. Lencke opined that while the etiology of her pain was "probably multifactorial," there was no evidence of neuropathology. He suspected that there was a "large functional/emotional overlay" to Plaintiff's symptoms. Tr. 169-171.

Plaintiff was examined by Dr. William Felmly, an orthopaedic surgeon, on September 30, 1998. Dr. Felmly concluded that Plaintiff's complaints of low back pain did not make sense when compared to her x-rays. He opined that the spondylolysis at Plaintiff's L5 vertebra had probably been present for a long time and certainly was "not something that is acute over the last several months particularly from spinal anesthetic." Dr. Felmly remarked that there had been "some underlying nonorganic elements to this exam that would suggest [Plaintiff's symptoms were] not anatomic" and added he did not see anything structurally in Plaintiff's spine that would be "a source of around the clock 24 hour pain and discomfort in the lower back," or "that would suggest she could not return to her routine duties." Tr. 184.  On October 7, 1998, Plaintiff returned to Dr. Felmly's office to review and discuss her MRI. Plaintiff reported a flare up of neck pain symptoms, which she earlier indicated were under control. Dr. Felmly opined that Plaintiff's lysis in her lumbar spine looked well-established and predated her rectal surgery. Tr. 181-182.

Plaintiff was treated by Dr. McKay Brabham, III, a rheumatologist, from September 22 to October 2, 1998. Dr. Brabham noted on September 22, 1998, that Plaintiff had symmetrical deep tendon reflexes of 2+, no gross motor or sensory deficits, negative straight leg raising tests, tenderness in her back muscles, and full range of motion in her joints without synovitis or

8

deformity.   He prescribed Prednisone for three weeks.   Tr. 178-179.   On October 2, 1998,

Plaintiff reported to Dr. Brabham that Prednisone had not helped her.  He discussed with Plaintiff

the possible causes of her symptoms, but she continued to insist that the symptoms resulted from

her hemorrhoidectomy.   Tr. 176.

Dr. Frank Pusey, a neurologist, completed nerve conduction studies of Plaintiff's upper

and lower extremities on October 6, 1998.   Dr. Pusey found evidence of "mild" right carpal

tunnel syndrome, but no evidence of superimposed cervical or lumbar radiculopathy.   Tr. 180.

On November 20, 1998, Dr. Marcy Bolster, a rheumatologist at the Medical University

of South Carolina in Charleston, South Carolina, examined Plaintiff.   Plaintiff reported that

physical therapy improved her neck a lot, but her neck pain increased after she stopped going.

Dr. Bolster noted that Plaintiff had 5/5 strength in all muscle groups, showed normal sensory

response, had negative straight leg raising, had negative Tinel's and Phelen's signs, had no

synovitis in her joints, and had symmetrical 2+ reflexes bilaterally.   She noted that Plaintiff had

tenderness in her neck, paraspinous tenderness in her back, and had ten tender "trigger points."

Dr. Bolster suspected that Plaintiff had myofascial pain syndrome, even though her symptoms

were localized to her neck and back.  She questioned whether there was a component of depression

in Plaintiff's problems.   Dr. Bolster instructed Plaintiff to discontinue her other medication and

begin taking Trazadone and Voltaren, to consider taking an antidepressant, and engage in physical

therapy and exercise.   Tr. 192-196.

Dr. John Glaser, an orthopaedist, examined Plaintiff on December 23, 1998.  He explained

that there were surgical options for Plaintiff's neck and lower back, but he wanted her to explore

non-surgical treatment first.  He felt that the best course of treatment was for Plaintiff to maximize

her function and referred her to a physical medicine and rehabilitation specialist, Dr. Elizabeth Rittenberg. Tr. 189-190. Dr. Rittenberg examined Plaintiff on January 8, 1999. She noted that Plaintiff had 3+symmetrical reflexes, 5/5 muscles strength in her upper and lower extremities bilaterally, and diminished cervical and lumbar range of motion on flexion and extension. Dr. Rittenberg opined that since other treatment modalities had been ineffective in alleviating Plaintiff's symptoms, a comprehensive pain management program was her best option. Dr. Rittenberg offered to enroll Plaintiff in the MUSC pain program, but Plaintiff refused, stating she preferred to participate in a program closer to home. Tr. 187-188.

Plaintiff was treated on February 25 and May 7, 1999 by Dr. Leo Walker at S.C. Endocrine and Metabolic Consultants. After examining Plaintiff one time, Dr. Walker diagnosed Plaintiff with cervical spondylosis with compression neuropathy and fibromyalgia/pyriformis syndrome. He thought that Plaintiff would most likely require surgical intervention, but treated her conservatively with traction and medicine. Dr. Walker opined that Plaintiff's fibromyalgia syndrome was crippling her with pain and she was totally disabled for a minimum of three months. Tr. 225-229.

On February 15, 1999, Plaintiff underwent an initial intake evaluation at the Palmetto Baptist Center for Pain Management. Dr. Matthew Midcap, a pain management specialist, examined Plaintiff. He noted that Plaintiff became defensive and refused to do any lumbar spine or neck movements when asked, stating that Dr. Walker told her not to do them. Dr. Midcap noted that Plaintiff exhibited tenderness everywhere she was touched and breakaway weakness in all of her upper extremities, but had negative straight leg raising from a seated position, 5/5 strength, intact sensory responses, and 2+ reflexes of all of her extremities. He was uncertain

10

whether Plaintiff met the diagnostic criteria for fibromyalgia and told Plaintiff that he, unlike Dr. Walker, felt that Plaintiff should be put through a rather comprehensive program of pain rehabilitation.     Dr. Midcap recommended his clinic's full pain management program, but remarked that he was "not hopeful" that Plaintiff would accept his advice. Tr. 231. Dr. Midcap's colleague, physical therapist Kimberly Shull-Massey, reported that Plaintiff's score on a pain questionnaire indicated "exaggeration and a need for psychological intervention." Tr. 233.

Plaintiff was examined by Dr. J. Talley Parrott, an orthopaedist, on June 15, 1999. Dr. Parrott noted that Plaintiff showed "abundant evidence of psychogenic magnification pain behavior" and "[u]nrealistic restrictive motion." He found no neurologic abnormalities of any of Plaintiff's extremities, and noted that x-rays of her neck and lumbar spine were generally unremarkable. Tr. 263.

On January 2, 2001, Dr. William Brannon, a neurologist, examined Plaintiff. Plaintiff reported constant pain in her neck, muscle spasms in her neck, pain in both upper extremities (particularly on the right), and numbness and tingling that occasionally caused her to lose sensation in all of her fingers. She also reported low back pain, which did not radiate into her lower extremities. Tr. 305. Dr. Brannon wrote that none of Plaintiff's numerous doctors had described any neurologic abnormalities. He noted that although a psychiatrist had recommended that Plaintiff pursue mental health therapy, she had not done so. Dr. Brannon reported that during the examination, Plaintiff's affect was "rather passively hostile," but she showed no signs of significant depression. His examination revealed that Plaintiff exhibited no drifting of her outstretched arms, and that she was able to hold her arms outstretched for several minutes without compliant if she was distracted. Dr. Brannon reported that Plaintiff exhibited give way weakness

in her right upper extremity, but she had normal strength in all other extremities.  He also noted that Plaintiff also had normal sensory responses in all extremities and symmetrical deep tendon reflexes.  Dr. Brannon found that Plaintiff had no clinical signs of a herniated disc and no abnormality in the neurological examination.  He opined that she had functional somatic syndrome manifested by chronic pain complaints and somatization.  Tr. 305-306.

The ALJ's determination that Plaintiff could perform a range of work despite her mental impairments is also supported by substantial evidence.  On September 4, 1999, Plaintiff was examined by Dr. Robespierre Del Rio, a psychiatrist.  Tr. 265-268.   Dr. Del Rio noted that Plaintiff drove herself to the examination and was able to ambulate with minimal difficulty, although she appeared to be in severe pain during the examination.  Tr. 265.  He reported that Plaintiff was well-oriented and exhibited intellectual functioning within the normal range of intelligence.  She had coherent speech, rational and goal-directed thought processes, no memory problems, no thought disorders, "fair to good' insight, and good judgment.  Tr. 266-267.  Dr. Del Rio found that Plaintiff had no impairments in social functioning and could complete tasks, receive and integrate new information, and adapt to stressful situations.  He noted that Plaintiff had a depressed affect with congruent mood, but she denied any suicidal/homicidal ideation, denied any type of hallucinations, and showed no evidence of delusional or paranoid ideation.  Tr. 266.  Dr. Del Rio opined that Plaintiff had a "pain disorder associated with both psychological factors and a general medical condition, depressive disorder, not otherwise specified, anemia by history, and status post hemorrhoid surgery."  Tr. 268.  He noted that Plaintiff had not been treated by any local mental health care provider and opined that she required "a comprehensive neurological evaluation in order to properly assess and evaluate her physical disability/impairment."  Dr. Del

12

Rio recommended that Plaintiff initiate contact with a local mental health center for assessment and treatment of her depressive symptoms.  Tr. 268.

Dr. Clay Drummond, a psychologist with the Palmetto Baptist Center for Pain Management, reported that Plaintiff's scores on the Beck Depression scale indicated "mild to moderate depression."    Tr. 236.    He noted that Plaintiff's profile classification was "dysfunctional" on the Multidimensional Pain Inventory profile.  Tr. 236.  Her scores on the Million Clinical Multiaxial Inventory (a personality assessment) were in the "severely high range on the histrionic and compulsive clinical personality pattern subscales" and were in the "moderately severely high range on somatoform disorder clinical syndrome subscale," which Dr. Drummond opined showed "that at least some energy from negative or conflictual areas of her life [was] being somatized."  Tr. 236.  Dr. Drummond recommended that Plaintiff enroll in the clinic's full pain management program which would include treatment of her depressive and anxiety symptoms, stress management, and assistance coping with psychosocial stressors.  Tr. 236-237.

The ALJ's decision is also supported by the opinion of the State agency physicians and psychologists who reviewed Plaintiff's medical records and completed residual functional capacity ("RFC") assessments.  20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency … [physicians ]… regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review.").  On October 14, 1999, Dr. Edward Haile, Jr., a State agency medical consultant, reviewed Plaintiff's record and concluded that there was no evidence that Plaintiff had a severe physical impairment.  Tr. 291.  On January 11, 2000, Dr. Darla

13

Mullaney, a State agency medical consultant, reviewed Plaintiff's record and completed a Physical RFC Assessment form in which she opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, was limited in her ability to perform repetitious pushing and/or pulling with her upper extremities, and could do no climbing.  Tr. 284.  On September 22, 1999, Dr. Manhal Wieland, a State agency psychological consultant, reviewed Plaintiff's records and concluded that Plaintiff's depressive disorder and pain disorder were severe mental impairments that often interfered with her concentration, persistence, and pace; these impairments slightly limited Plaintiff's activities of daily living and social functioning; but these impairments never caused her to decompensate."  Tr. 292-299.  Dr. Wieland completed a Mental RFC Assessment form in which he opined that Plaintiff's mental impairments caused her to be "moderately limited" in her ability to maintain attention and concentration for extended periods, interact appropriately with the general public, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  Tr 301-302.  Dr. Wieland opined that Plaintiff could probably "attend to and perform simple tasks for 2+ hours without special supervision."  Tr. 303.  On January 13, 2000, Dr. Lisa Smith Klohn, a State agency psychological consultant, affirmed Dr. Wieland's findings and conclusions.  Tr. 282, 292.

14

The ALJ's decision to discount the opinions of consulting physicians Dr. Scott Boyd[4] and

Dr. Walker that Plaintiff was disabled is supported by substantial evidence. Dr. Boyd was not a

treating medical source. Dr. Boyd's interpretation of the MRI of Plaintiff's cervical spine was not

supported by the observations of Plaintiff's other treating and examining physicians. Dr. Boyd

and Dr. Walker offered no specific functional limitations to support their opinions. Dr. Walker's

diagnoses were neither within his medical specialty (endocrinology) nor confirmed by a specialist

in the appropriate field. Additionally, an ALJ is not bound by a conclusory opinion of disability

or entitlement to benefits, even when rendered by a treating physician, since the issue of disability

is the ultimate issue in a Social Security case and that issue is reserved for the Commissioner. See

20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027

(10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(statements

that a claimant could not be gainfully employed are not medical opinions, but opinions on the

application of the statute, a task assigned solely to the discretion of the Commissioner); King v.

Heckler, 742 F.2d 968 (6th Cir. 1984); Montijo v. Secretary of Health & Human Servs., 729 F.2d

599, 601 (9th Cir.1984). Further, Dr. Walker's disability opinion did not meet the twelve-month

duration requirement. See 20 C.F.R. § 404.1509 (physical or mental impairment must last for

a continuous period of at least twelve months).

---

[4]On October 4, 1999, Dr. Scott Boyd, a neurosurgeon, examined Plaintiff. Plaintiff reported that deep heat helped her neck and right arm pain "somewhat," but that she felt her symptoms were getting worse. Tr. 280. Dr. Boyd reviewed Plaintiff's MRI scans and concluded that she had "a fairly large disc herniation at C5-6," which he believed encroached on her C6 nerve root. Dr. Boyd recommended an anterior cervical disckectomy and on October 8, 1999, wrote a note that Plaintiff was "currently disabled due to neck injury since May 1998." Tr. 279-281. On October 26, 1999, Dr. Boyd again opined that Plaintiff was disabled and had a herniated cervical disc. Tr. 278.

The ALJ's decision to discount Dr. Brannon's Medical Source Statement of Ability to Do Work-Related Activities (Physical")" form is also supported by substantial evidence. On the form, Dr. Brannon indicated that Plaintiff could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for less than two hours in an eight-hour workday; needed to alternate sitting and standing to relieve pain or discomfort; and was limited in her ability to push and/or pull with her upper extremities. Tr. 307-308. Dr. Brannon, however, wrote on the form that there were "no clinical findings to support the above conclusions" and that "[t]he checked boxes reflect the patient's perspective." Tr. 308. He also indicated that the postural, manipulative, and environmental limitations appearing in the remainder of the form were also based on Plaintiff's subjective complaints. Tr. 308-309. The ALJ properly discounted Dr. Brannon's medical source statement because it was based on Plaintiff's subjective complaints, which the ALJ properly found were not entirely credible (as discussed below). See Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001)(finding no error in ALJ's decision to assign physician's opinion lesser weight where the physician's diagnosis was based largely upon claimant's self-reported symptoms).

B.    Credibility/Subjective Complaints

Plaintiff alleges that the ALJ failed to properly evaluate her subjective complaints and credibility. In particular, she argues that her subjective complaints are supported by Dr. Brannon's finding that she has functional somatic syndrome. The Commissioner contends that the ALJ properly took into account Plaintiff's subjective complaints and concluded that Plaintiff's testimony was not credible to the extent she claimed she was precluded from performing all substantial gainful activity.

16

In assessing credibility and complaints of pain, the ALJ must (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he or she suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ properly considered the entire record, including the objective and subjective evidence, in making his determination that Plaintiff could work despite her pain. As discussed above, the ALJ's decision is supported by the medical evidence. Plaintiff's credibility is undermined by evidence that she was noncompliant with recommendations of some of her treating and examining doctors and ignored and did not follow through with some recommended courses of treatment. See English v. Shalala, 10 F.3d 1080, 1083-1084 (4th Cir. 1993); see also Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir. 1993); 20 C.F.R. § 404.1530(a) and (b) ; Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999)(ALJ may consider a claimant's failure to follow treatment advice as a factor in assessing claimant's credibility). Specifically, after Dr. DuBose prescribed

17

a low dose of Neurontin and encouraged Plaintiff to enroll in the full pain management program at Baptist Medical Center (Tr. 161, 163, 165), she refused to fill the Neurontin prescription because she decided it was seizure medication, and she did not enroll in the pain program (Tr. 256). Plaintiff also rejected the suggestion of her treating physician (Dr. Beaver) that she see a rheumatologist to confirm his opinion that she had "some fibromyalgia." Tr. 258. Plaintiff was uncooperative during a neurological examination with Dr. Lencke, refusing to allow him to perform a funduscopic examination of her eyes, test her neck strength, or complete coordination testing. During the same examination, Dr. Lencke was unable to grade Plaintiff's muscle strength because she gave way in all muscle groups. Tr. 170. During a physical examination with Dr. Midcap, Plaintiff became defensive and refused to do any of the requested lumbar spine or neck movements. Tr. 231. At the first hearing, Plaintiff testified that she was not taking any prescription medications, only Tylenol, Advil, or Motrin, despite her alleged pain. Tr. 41. There is no indication, other than the 2001 consultative examination arranged by the State agency, that Plaintiff sought any medical treatment after October 1999. See Tr. 46-48. Non-medical evidence also supports the ALJ's decision. Plaintiff reported to Dr. Del Rio that she was able to maintain her activities of daily living without assistance and was able to shop, cook, clean and perform household chores including laundry. Tr. 267.

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

18

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, <u>Richardson v. Perales</u>, <u>supra</u>.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, <u>Blalock v. Richardson</u>, <u>supra</u>.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  <u>Shively v. Heckler</u>, <u>supra</u>.  It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

January 6, 2006
Columbia, South Carolina